JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CIV 1354

------------------------------------------------------------x

CRAIG MATTHEWS,

    Plaintiff

  -versus-

CITY OF NEW YORK; RAYMOND KELLY,
as Commissioner of the New York City Police
Department; JON BLOCH, a deputy inspector in
the New York City Police Department; MARK
SEDRAN, a lieutenant in the New York City Police
Department,

    Defendants

------------------------------------------------------------x

**COMPLAINT**
**JURY DEMANDED**

RECEIVED
FEB 23 2012
U.S.D.C. S.D.N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1. This is a civil rights action to vindicate the right of police officers in the New York City Police Department ("NYPD") to speak out against the use of illegal quotas without facing retaliation. The plaintiff Craig Mathews is a 14-year veteran police officer with an exemplary record who been subjected to a campaign of retaliation and harassment for having reported the existence of a highly developed quota system in the 42nd Precinct in the Bronx. This retaliation comes in the context of a city-wide controversy over the NYPD's use of illegal quotas and the damage such quotas inflict on innocent people, policing, and police-community relations.

2. Since 2008, supervisors in the 42nd Precinct have developed and implemented a system of quotas mandating numbers of arrests, summonses, and stop-and-frisks (with one supervisor describing stop-and-frisks as being "worth their weight in gold"). As part of the

1

regime for enforcing these quotas, supervisors have developed a detailed monitoring system that includes computer reports that use color coding to categorize officers in terms of their compliance with quotas. Current reports use black ink to identify officers who are meeting quotas, silver ink to identify officers who are meeting only some quotas, and red ink to identify officers who are not meeting quotas. Officers in the precinct are constantly pressured to meet the quotas, and those do not are subject to punishment including undesirable assignments, the loss of overtime, denial of leave, separation from partners, and poor evaluations.

3. Concerned about the impact of illegal quotas on policing and police-community relations, Officer Matthews on at least four occasions has notified commanding officers of the 42nd Precinct about the quota system being used by mid-level supervisors. In response to having spoken out about the precinct's quota system, Officer Matthews has been retaliated against in ways that are more severe and differ from the punishment being imposed on the many other officers not meeting the quotas. And at a roll call last month, a supervisor running the quota program said, "If you come after me, I will come back after you harder."

4. The quota system in the 42nd Precinct has pitted police officers against each other, straining professional relationships and diverting resources away from law enforcement activities. Officers who comply with the quotas have had their precinct lockers dislodged and overturned, with the lockers sometimes being placed in the shower or their locks being plastered shut. This practice of "locker flipping" has escalated to the point where on-duty police officers are now assigned to guard the precinct's locker room around the clock.

5. The use of an illegal quota system in the 42nd Precinct reflects a larger crisis in the NYPD. For several years, the Department has been engulfed in a scandal about its use of quota systems that lead to innocent New Yorkers being stopped and frisked, given summonses, and even arrested. Through tape recordings, officer complaints and admissions, and newspaper reports, quota systems have been uncovered across the city.

6. The defendants have violated Officer Matthews' rights under the First Amendment and New York Constitution. He seeks an injunction requiring the defendants to cease all actions in retaliation for his protected speech, as well as an award of compensatory damages and attorney's fees.

## PARTIES

7. Plaintiff CRAIG MATTHEWS is a police officer employed by the New York City Police Department in the Bronx.

8. Defendant CITY OF NEW YORK is a municipality organized under the laws of the State of New York.

9. Defendant RAYMOND KELLY is the Commissioner of the New York City Police Department and has his office at 1 Police Plaza, New York, N.Y. 10038. Mr. Kelly is sued in his official capacity.

10. Defendant JON BLOCH is the commanding officer of the 42nd Precinct of the New York City Police Department.

11. Defendant MARK SEDRAN is a lieutenant in the 42nd Precinct of the New York City Police Department.

## FACTUAL ALLEGATIONS

12. For several years, the New York City Police Department has been engulfed in a scandal about its use of illegal quotas. The NYPD's use of illegal quotas was dramatically exposed by a series of audio recordings made by an officer assigned to the 81st Precinct in Brooklyn, which revealed his supervisors announcing mandated numbers for arrests, summonses, and stop-and-frisks. Requiring officers to meet quotas inevitably leads them to make arrests, issue summonses, and conduct stop-and-frisks of innocent people. Not coincidentally, street stops conducted by NYPD officers have exploded in number in recent years, going from fewer than 100,000 in 2002 to nearly 700,000 last year.

13. Starting in May 2010, *The Village Voice* ran a series of articles focusing on the quota system in the 81st Precinct. In August 2010 then-Gov. David Paterson signed legislation expanding the scope of the state's anti-quota statute to ban retaliation for not meeting quotas for tickets, summonses, arrests, and stop-and-frisk encounters. Before it was amended, the anti-quota law only covered traffic violations.

4

14. In just the last six months, several controversies about NYPD quotas have arisen. In January of this year, the NYPD was ordered to arbitrate a grievance brought by an officer who claims there is a pervasive quota system in the 20th Precinct on the Upper West Side of Manhattan. In October 2011 a narcotics detective in Queens admitted that the use of quotas by the NYPD led him and other officers to plant cocaine on innocent individuals in order to boost their arrest numbers. The officer, a former narcotics detective named Stephen Anderson, testified in court that he participated in the practice – called "flaking" – when his co-workers needed last-minute arrests to fulfill their quotas. Anderson testified that he and his partner had a "number to reach" and that they planted drugs on innocent people because his partner was "worried about getting sent back [to patrol] and . . . the supervisors getting on his case." And in August 2011 a federal judge in the Southern District of New York, in denying the NYPD's motion for summary judgment in a class-action challenge to the stop-and-frisk program, described the recordings from the 81st Precinct as "smoking gun" evidence of the existence of quotas.

15. Despite the public controversy about its quota system and despite the recent quota legislation, the NYPD has refused to admit that illegal quotas exist while continuing to enforce them in precincts across the city. As a result, individual police officers face intense pressure to comply with orders to meet illegal quotas.

16. Plaintiff Police Officer Craig Matthews is a 14-year veteran assigned to the 42nd Precinct in the Bronx, where he has been since 1999. During his time at the 42nd Precinct, Officer Matthews has received over 20 awards for his police work.

5

17. Until recently, Officer Matthews consistently received positive annual reviews. For instance, his review for 2004 stated, "P.O. Matthews is incorruptible. He has the highest level of integrity and displays a great sense of morals." His 2005 review said, "P.O. Matthews is always desirous and willing to work, and is able to do his job with little or no direction"; and his 2007 review described him as "an experienced officer who is a valuable asset to this precinct . . . [and who] is able to complete his assignments with little or no instructions."

18. In 2008 supervisors in the 42nd Precinct started to pressure officers to meet numerical quotas for arrests, summonses, and stop-and-frisks. For Officer Matthews' squad, this quota system was created by his platoon commander, Lieutenant Mark Sedran. In 2009 Sedran refined the quota system by putting in place a point system whereby he awarded points for what he considered "good" summonses – meaning hazardous summonses – and subtracted points for non-hazardous summonses. (Hazardous summonses refer to moving violations issued for traffic infractions that are more likely to cause accidents on the roadways, such as using a cell phone while driving or disobeying traffic signals.) Officers who did not meet the quotas were subjected to a wide range of punishment, including undesirable assignments, loss of overtime, and denial of requested days off.

19. Officer Matthews recognized that such a quota system violates the NYPD's core mission and his own commitment as a police officer to protect and serve the public at large. As a result, he was unwilling to participate in a practice that would damage the communities he was entrusted to protect.

20. In February 2009 Officer Matthews reported to the precinct's commanding officer, Captain Timothy Bugge, that a quota system had been established in the precinct. When the quotas continued, he again reported them to Captain Bugge in March and April 2009 and reported them to the precinct executive officer in May 2009.

21. In June 2009 Captain Bugge told Officer Matthews that he had spoken with Lieutenant Sedran and that the situation was handled. In fact, the quota system continued, with Lieutenant Sedran saying in a roll call that he would use it secretly. In addition, Lieutenant Sedran embarked on a campaign of retaliating against Officer Matthews for having reported the quota system to the precinct's commanding officers. As part of that campaign, Officer Matthews has been given punitive assignments (such as footposts or prisoner transport), been denied overtime, been denied leave, been separated from his career-long partner, and been the target of humiliating treatment by his supervisors. Unlike the punishment imposed on the many other officers who have failed to meet quotas, Lieutenant Sedran's harassment of Officer Matthews was constant and personal. He treated Officer Matthews differently from other officers, targeting him even for the most minor infractions.

22. In October 2009 Captain Bugge informed Officer Matthews that he would not interfere with how supervisors ran their platoons. At this point Officer Matthews concluded that it was futile to notify Captain Bugge further about the quota system.

23. In 2010 mid-level precinct supervisors began producing regular computer reports with the number of summonses issued by each officer, with distinctions between types of

7

summonses that were considered more desirable and those considered less desirable. Officers who did not make their quotas were highlighted in red on these activity reports, while officers who had made their quotas were listed in black.

24. In the spring of 2010 Sergeant Sean Wick, who supervised Officer Matthews' squad, was explicitly instructed to deny all requests for emergency days off and vacation time because of the squad's numbers. On a May 2010 Compstat report, Lieutenant Sedran wrote the following note: "Sean, your squad's activity is the worst in the command re. B's + C's. No E-days, vac days or lost time are to be granted to anyone in your squad." In police jargon, the phrase "B's + C's" refers to violations and summonses of varying degrees of severity.

25. Officer Matthews faced continued retaliation throughout 2010, causing him to suffer both mentally and physically. At the end of the year, he went to the emergency room for what he thought was a heart attack, and his symptoms were ultimately attributed to extreme stress.

26. During the first week of January 2011, Officer Matthews twice asked Lieutenant Sedran for a day off so he could get a cardiovascular test. Lieutenant Sedran denied both requests and stated he was surprised Officer Matthews had the nerve to request a day off after "fighting" Lieutenant Sedran about activity every month.

27. Officer Matthews' annual evaluation for 2010, which was completed by Lieutenant Sedran and Sergeant Wick -- the platoon commander and sergeant whom Officer

8

Matthews had repeatedly implicated in the precinct's quota system -- rated Officer Matthews lower than previous reviews in virtually every category. This review gave Officer Matthews an overall evaluation score of three out of five, which is the lowest passing score and is significantly below his normal rating. The review also included comments highly critical of his outspokenness. For instance, the review stated that Officer Matthews is "difficult to work with, he questions his assignments and wants to debate every issue." Lieutenant Sedran wrote that Officer Matthews "has a contrarian attitude and can be abrasive when given instruction." Officer Matthews understood these comments to refer specifically to his complaints to the precinct commanding officer about the quota system.

28.  In January 2011 Officer Matthews met with defendant Deputy Inspector Jon Bloch (then a captain), who had become the precinct commanding officer in 2010. In the presence of another officer and the precinct's executive officer, Officer Matthews informed Bloch about the quota system and that it was causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers. Officer Matthews also told Bloch that the quota system was having an adverse effect on the precinct's relationship with the community. Captain Bloch became irate and ordered Officer Matthews and the others out of his office.

29.  In this meeting, as in all of his reports to Captains Bugge and Bloch, Officer Matthews voiced precisely the sort of concern about policing practices that the NYPD encourages New Yorkers to voice to the commanding officers of their precincts. Each precinct has a community council run by local residents that meets each month, and commanding officers

9

regularly attend these meetings. In the 42nd Precinct, the community council meets on the fourth Thursday of every month in the precinct's station house, and each meeting includes an open microphone portion that allows citizens to discuss policing issues directly with precinct supervisors. Deputy Inspector Bloch regularly attends these meetings in his capacity as the precinct's commanding officer.

30. Local residents also can voice their concerns about police practices by walking into the station house to meet with Deputy Inspector Bloch or by calling the precinct, where the officers answering the phones can transfer anyone to Deputy Inspector Bloch's direct phone line.

31. Discussing concerns about police practices with residents of the precinct is an integral part of the commanding officer's job. After the audio tapes revealing the quota system in the 81st Precinct were released, Commissioner Raymond Kelly appointed Deputy Inspector Juanita Holmes to be the commanding officer of the 81st Precinct. Deputy Inspector Holmes attended a community meeting in the precinct to address concerns about the quota system.

32. Since his January 2011 meeting with Deputy Inspector Bloch, Officer Matthews has been subjected to heightened retaliation that differs from the punishment inflicted on the many other officers who have failed to meet quotas, making it clear that this retaliation is a result of his speaking out against the quota system. For example, in late November 2011 Captain Bloch and Lieutenant Sedran stopped Officer Matthews near the end of his shift and pulled him from his assigned sector. In front of other officers, Lieutenant Sedran told Officer Matthews that they were going to drive him around the precinct and gave him a "goal" of obtaining eight

10

arrests. This was an effort to humiliate Officer Matthews in front of his colleagues. Officer Matthews was specifically targeted instead of other officers who failed to meet the quotas because he spoke out against the quota system.

33. Officer Matthews also has been assigned duties that present a risk to his personal safety, such as transporting multiple prisoners without the standard number of back-up officers. On January 15, 2012, for example, Lieutenant Sedran ordered the three officers who had accompanied Officer Matthews on a prison transport to be reassigned, intentionally leaving Officer Matthews alone to process thirteen prisoners.

34. In addition, Officer Matthews has been denied overtime and time off and has been deliberately barred from the sorts of job assignments that an officer of his seniority would usually receive. For example, an officer of Officer Matthews' seniority would generally receive Critical Response Vehicle ("C.R.V.") assignments, which guarantees overtime every shift. Lieutenant Sedran has consistently denied Officer Matthews these assignments. When Lieutenant Sedran was out sick for two days in December 2011, however, Officer Matthews received C.R.V. assignments.

35. In December 2011 the computer reports used in conjunction with the quota system in the 42nd Precinct were changed to reflect an even more discriminating monitoring system. Whereas prior reports had labeled officers in black and red ink depending upon their compliance with quotas, the new reports add a silver category for officers who are meeting quotas in some categories but not in others. A recent version of this report covering the first two

11

weeks of January 2012 provides figures for 155 individual officers, with 15 officers in black ink, 90 in silver ink, and 60 in red ink.

36.     On January 5, 2012, Officer Matthews was further targeted for disclosing the precinct's quota system when Sergeant Wick announced that Officer Matthews would be permanently separated from his career-long partner and that Sergeant Wick himself would be Officer Matthews' new partner. While additional officers failed to meet their assigned quotas, only Officer Matthews was permanently assigned to partner with a supervisor.

37.     During roll call on January 8, 2012, Lieutenant Sedran threatened Officer Matthews, stating: "If you come after me, I will come back after you harder." Officer Matthews understood this threat was directed towards him for his having reported Lieutenant Sedran's illegal quota system to the precinct's commanding officers.

38.     On February 23, 2012 (the day of the filing of this lawsuit), Officer Matthews received his evaluation for 2011. Completed by Deputy Inspector Bloch and Sergeant Wick, the evaluation gives Officer Matthews an overall rating of 2.5, an extraordinarily low rating that subjects him to close monitoring and puts him at risk of being fired. Not surprisingly in light of their prior responses to Officer Matthews' complaints about the quota system, the review specifically notes that "[h]e needs to be directed to issue summons and make arrests" [sic] and claims he "is argumentative and questioning regarding his assignments." This evaluation grossly distorts Officer Matthews' performance and is in retaliation for his having spoken out about the quota system.

## JURISDICTION AND VENUE

39. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). This Court has supplemental jurisdiction over all state constitutional and state law claims pursuant to 28 U.S.C. § 1367(a).

40. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) in that defendant City of New York is located within the Southern District of New York.

41. The defendants' actions have been taken under the color of law.

## CAUSES OF ACTION

### First Cause of Action

42. The defendants have violated the plaintiff's rights under the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

### Second Cause of Action

43. The defendants have violated the plaintiff's rights under Article I, § 8 of the New York State Constitution.

## JURY DEMAND

44. The plaintiff demands a jury for each of his claims.

WHEREFORE, the plaintiff requests that this Court:

(1) Assume jurisdiction over this matter;

(2) Issue a declaration that the defendants violated the plaintiff's rights under the First Amendment of the United States Constitution and Art. I, § 8 of the New York State Constitution;

(3) Issue an injunction ordering the defendants to cease from engaging in any further action in retaliation for Officer Matthews' exercise of his free speech rights and ordering the defendants to restore to Officer Matthews all benefits he lost as a result of adverse employment action to reverse any retaliatory actions taken against Officer Matthews;

(4) Order the defendants to pay compensatory damages to the plaintiff;

(5) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and

(6) Order any other relief the court deems appropriate.

Respectfully submitted,

*[signature]*

CHRISTOPHER DUNN
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300

Dated: February 23, 2012
        New York, N.Y.

Counsel for Plaintiff

On the Complaint:

KATE DONIGER*
Law Student
New York University School of Law
Civil Rights Clinic

HOLLY MOWFORTH*
Law Student
New York University School of Law
Civil Rights Clinic

JAKE TRACER*
Law Student
New York University School of Law
Civil Rights Clinic

* The Plaintiffs and the New York Civil Liberties Union Foundation will be seeking leave of court to permit these students to serve as attorneys in this matter pursuant to the Southern District's Student Practice Plan.