UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                    :

CRAIG MATTHEWS,                :

                        Plaintiff,   :               12 Civ. 1354 (PAE)

                              :          OPINION & ORDER

            -v-              :

CITY OF NEW YORK, RAYMOND KELLY, JON    :
BLOCH, and MARK SEDRAN,      :

                        :

                    Defendants.   :

                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Craig Matthews, a member of the New York City Police Department ("NYPD"),

brings this action pursuant to 42 U.S.C. § 1983 against the City of New York, NYPD

Commissioner Raymond Kelly, Deputy Inspector Jon Bloch, and Lieutenant Mark Sedran

(collectively, "defendants" or "the City").  Officer Matthews alleges that defendants violated his

First Amendment rights when they, allegedly, retaliated against him after he raised concerns to

the precinct's commanding officers about a policy being implemented by mid-level supervisors

in his precinct.  That policy allegedly required each patrol officer to meet a quota of arrests, stop-

and-frisks, and summonses each month.  Defendants move for summary judgment.  They argue

that Officer Matthews' speech is unprotected by the First Amendment, because he was speaking

pursuant to his official employment duties when he reported the quota system to his commanding

officers.  For the reasons that follow, defendants' motion for summary judgment is granted.

## I.      Background and Undisputed Facts[1]

Officer Matthews has been employed by the NYPD for 16 years.  Matthews Decl. ¶ 4;

Matthews Dep. 9.  During the last 14 years, he has been assigned to the 42nd Precinct.  Matthews

Decl. ¶ 5; Matthews Dep. 9.  His current rank is "Police Officer."  Matthews Decl. ¶ 3.

### A.      Officer Matthews' Speech

The parties have stipulated that, for purposes of resolving this motion, Officer Matthews'

speech occurred in the manner alleged in the Complaint.  *See* Def. Br. 1; Pl. Br. 6 n.1; Def. Reply

Br. 1 n.1.

The Complaint alleges that, beginning in 2008, mid-level supervisors in the 42nd Precinct

"developed and implemented a system of quotas mandating numbers of arrests, summonses, and

stop-and-frisks."  Compl. ¶ 2.  To enforce these quotas, supervisors developed a system that

assessed officers using color-coded reports that identified who was meeting, partially meeting,

and not meeting his or her quotas.  *Id.*  The quota system in Officer Matthews' squad was further

refined by his platoon commander, Lieutenant Mark Sedran.  Lieutenant Sedran created a system

that awarded points for "good summonses"—those that addressed hazardous behavior, such as

use of a cell phone while driving—and subtracted points for non-hazardous summonses.  *Id.*

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including: the Declaration of William S.J. Fraenkel in Support of Defendants' Motion for Summary Judgment ("Fraenkel Decl.") (Dkt. 37), and attached exhibits; the Affidavit of Officer Craig Matthews ("Matthews Decl.") (Dkt. 41); the Declaration of Erin Beth Harrist in Opposition to Defendants' Motion for Summary Judgment ("Harrist Decl.") (Dkt. 40), and attached exhibits; the Declaration of William S.J. Fraenkel in Further Support of Defendants' Motion for Summary Judgment ("Fraenkel Reply Decl.") (Dkt. 46); the deposition of Officer Matthews, excerpts of which are attached as Exhibit D to the Fraenkel Declaration and Exhibit 1 to the Harrist Declaration ("Matthews Dep."); the deposition of the City's Rule 30(b)(6) witness, John Beirne, excerpts of which are attached as Exhibit C to the Fraenkel Declaration and Exhibit 6 to the Harrist Declaration ("Beirne Dep."); the deposition of Jon Bloch, Harrist Decl. Ex. 3 ("Bloch Dep."); and the deposition of Timothy Bugge, Harrist Decl. Ex. 4 ("Bugge Dep.").

¶ 18. Officers were allegedly under constant pressure to meet these quotas and were subject to punishment for not doing so. *Id.* ¶ 2.

Officer Matthews believed that the quota system violated the NYPD's core mission, and he was "unwilling to participate in a practice that would damage the communities he was entrusted to protect." *Id.* ¶ 19. Accordingly, in February 2009, Officer Matthews met with the precinct's commanding officer at the time, then-Captain Timothy Bugge, and informed Captain Bugge about the existence of the quota system. *Id.* ¶ 20. In March and April 2009, with the quota system having persisted, Officer Matthews met again with Captain Bugge. *Id.* In May 2009, Officer Matthews also reported the quota system to an unnamed precinct executive officer. *Id.* In June 2009, Captain Bugge told Officer Matthews that he had spoken with Lieutenant Sedran and that "the situation was handled." *Id.* ¶ 21. Nevertheless, Officer Matthews alleges, the quota system continued in secret. *Id.* In October 2009, Captain Bugge informed Officer Matthews that he would not interfere with how supervisors ran their platoons. At this point, Officer Matthews alleges, he concluded that it was futile to raise his concerns with Captain Bugge any further. *Id.* ¶ 22.[2]

In January 2011, Officer Matthews met with then-Captain Jon Bloch, who had replaced Captain Bugge in May 2010 as the precinct's commanding officer. *See* Bloch Dep. 13; Bugge Dep. 13. The meeting took place in Captain Bloch's office, with two other officers present. Compl. ¶ 28. Officer Matthews explained his concerns that the quota system was (1) "causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers," and (2) "having an adverse effect on the precinct's

---

[2] The Complaint does not specify where Officer Matthews' meetings with Captain Bugge occurred, but implies that they occurred in the precinct.

relationship with the community." *Id.* Officer Matthews has attested that when he raised these concerns, he did not identify any particular unjustified stop or arrest. Matthews Decl. ¶ 13.

Officer Matthews alleges that, as a result of his speech, he was subject to a campaign of retaliation. *Id.* ¶¶ 21, 25–27, 32–34, 36–38.[3]

### B.    Procedural History

On February 23, 2012, Officer Matthews filed the Complaint, which brings a § 1983 claim based on alleged infringement of his First Amendment rights, and a parallel claim under the New York Constitution. Dkt. 1; *see infra* note 7. On March 16, 2012, defendants moved to dismiss, arguing that Officer Matthews' speech was unprotected because it was made pursuant to his official employment duties—to wit, his inherent duty to enforce the law—and therefore that his § 1983 claim must fail. Dkt. 12. Honorable Barbara S. Jones, to whom this case was then assigned, granted defendants' motion. She reasoned: "Matthews' complaints to his supervisors are consistent with his core duties as a police officer, to legally and ethically search, arrest, issue summonses, and—in general—police." *Matthews v. City of N.Y.*, No. 12 Civ. 1354 (BSJ), 2012 WL 8084831, at *3 (S.D.N.Y. Apr. 12, 2012).

On appeal, the Second Circuit vacated that dismissal. It stated:

> The record in this case is not yet sufficiently developed . . . to determine as a matter of law whether Officer Matthews spoke pursuant to his official duties when he voiced the complaints made here in the manner in which he voiced them. *See Garcetti v. Ceballos*, 547 U.S. [410,] 424–26 [(2006)] (distinguishing between giving employees an internal forum for their speech and making certain speech a duty of employment). As we have recently observed, "whether a public

---

[3] Officer Matthews' allegations of retaliation are not at issue on this motion, which, for the reasons explained below, is based solely on defendants' argument that Officer Matthews did not engage in constitutionally protected speech. As alleged, the acts of retaliation against Officer Matthews consisted of: punitive assignment; denial of overtime and leave; separation from his career-long partner; humiliating treatment; and negative performance reviews. *See* Compl. ¶¶ 21, 25–27, 32–34, 36–38.

> employee is speaking pursuant to h[is] official duties is not susceptible to a brightline rule." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). The matter may require some inquiry into "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* Here, some discovery as to these matters is necessary before it can be decided whether Matthews can or cannot pursue a First Amendment retaliation claim in this case.

*Matthews v. City of N.Y.*, 488 F. App'x 532, 533 (2d Cir. 2012) (summary order).

Upon remand, the case was reassigned to this Court. On December 17, 2012, the Court held a conference with the parties to discuss fashioning a targeted discovery plan keyed to the factual issue identified by the Second Circuit. The parties thereupon submitted, and the Court approved, a joint case management plan providing for plenary document discovery, but limiting depositions to witnesses with knowledge of Officer Matthews' job responsibilities as they relate to the speech at issue. Dkt. 29.

On May 20, 2013, as contemplated at the December 17, 2012 conference, defendants filed a motion for summary judgment. They argued, this time based on the factual record developed in discovery, that Officer Matthews' speech was made pursuant to his official employment duties. *See* Dkt. 36 ("Def. Br."). On June 7, 2013, Officer Matthews opposed that motion. Dkt. 39 ("Pl. Br."). On June 14, 2013, defendants filed a reply. Dkt. 45 ("Def. Reply Br."). On July 19, 2013, the Court heard argument.

### C. Officer Matthews' Employment Duties

As contemplated by the Second Circuit in its summary order and this Court in its case management plan, discovery focused on the nature of Officer Matthews' employment duties. The evidence adduced on that point is as follows.

5

Section 202-21 of the NYPD Patrol Guide[4] sets forth the "Duties and Responsibilities" of a Police Officer. *See* Harrist Decl. Ex. 2. It lists 20 specific duties. It does not, however, describe, or purport to describe, the day-to-day activities of a Police Officer. Officer Matthews attested that his regular activities, which occupy 95% of his time on the job, involve:

> (1) going on radio runs, which are responses to 911 calls in the precinct, in addition to '311' requests, and requests that come through the station house telephone switchboard, (2) patrolling the streets and vertical patrolling of local housing, (3) filling out complaint reports and additional forms relating to criminal activity, lost property, and missing persons, including interviewing witnesses, (4) responding to traffic accidents, (5) transporting prisoners to and from the precinct house, courts, and hospitals, and (6) doing community visits with local businesses and organizations.

Matthews Decl. ¶ 6; *see also* Matthews Dep. 10 ("Q: [H]ow would you describe your job, the job of a police officer?  A: I enforce the law.").

Particularly relevant here, Section 207-21 of the Patrol Guide addresses the duty of a member of the NYPD to report allegations of "corruption or other misconduct against members of the service." It states, in pertinent part:

> All members of the service must be incorruptible. An honest member of the service will not tolerate members of the service who engage in corruption or other misconduct. *All members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.*

Fraenkel Decl. Ex. B (emphasis added). Section 207-21 defines "corruption/other misconduct" as "[c]riminal activity or other misconduct of any kind including the use of excessive force or perjury that is committed by a member of the service whether on or off duty." *Id.* It also

---

[4] The Patrol Guide "serves as a guide for ALL members of the service." Fraenkel Reply Decl. Ex. E (Foreword to the Patrol Guide) (emphasis in original). It "does not contain distinct instructions for every situation that may be encountered in the field," but its procedures "serve as performance expectations." *Id.* Matthews testified that he does not consider the Patrol Guide to be optional, and acknowledged that were he to not follow a provision of the Patrol Guide he would receive "[a]nything from a warning and admonish [*sic*] to a command discipline." Matthews Dep. 10–11.

provides a procedure for reporting such misconduct to the Internal Affairs Bureau.  It further states that "[f]ailure to report corruption, other misconduct, or allegations of such act is, in itself, an offense of serious misconduct and will be charged as such."  *Id.*

In deposition testimony, the parties offered differing interpretations of the extent to which an officer has a duty to report "misconduct" under Section 207-21.  Officer Matthews testified that his understanding of that provision is that he is not obligated to report *every* violation of the Patrol Guide, only those that amount to criminal misconduct, such as corruption, bribery, or excessive force.  *See* Matthews Dep. 14, 19, 21, 24–25, 33, 37, 39.  He testified that he acquired that understanding during his training at the police academy, *id.* at 24, 34, but he could not recall more specifically where in that training he learned of that limit on his duty to report, *id.* at 39.  Commissioner John Beirne, the City's Rule 30(b)(6) witness, offered a different understanding of Section 207-21.  He testified that whether an officer has a duty to report a particular event or practice generally turns on whether the officer reasonably believes it to be misconduct, and on the officer's "common sense."  *See* Beirne Dep. 26–27, 46–50, 55, 62–63.  However, he stated, some actions, such as corruption, criminal activity, and excessive force, must be reported regardless of any subjective belief on the part of the individual officer.  *Id.* at 50, 55.[5]

Commissioner Beirne, Captain Bloch, and Captain Bugge all testified that a Police Officer has no duty to monitor the conduct of his supervisors.  Beirne Dep. 22; Bloch Dep. 13; Bugge Dep. 25.  Rather, that job falls to the Integrity Control Officer—an officer with the

---

[5] Commissioner Beirne also testified that although some violations of the Patrol Guide's procedures would be misconduct that must be reported, he was "reluctant to say" that *all* violations of the Patrol Guide must be reported, because it is a "very voluminous document" and "[t]here probably are some things that don't necessarily have to be reported."  Beirne Dep. 48–49.  Commissioner Beirne testified that a numerical quota system, in and of itself, is not misconduct that an officer is obligated to report.  *Id.* at 36–37, 65.  However, if that quota resulted in unlawful activity, such as unjustified stops and arrests, it would need to be reported to the Internal Affairs Bureau.  *Id.* at 65, 67, 77.

specific duty of monitoring the conduct of personnel in the precinct, including supervisors, and reporting any misconduct to Internal Affairs.  Beirne Dep. 23; Bloch Dep. 21; Bugge Dep. 34–35; *see also* Harrist Decl. Ex. 11 (Patrol Guide Section 202-15, setting forth duties of the Integrity Control Officer).  Officer Matthews was never an Integrity Control Officer.  Matthews Decl. ¶ 12.

Officer Matthews attests that, aside from the specific occasions on which he raised his concerns about the quota system, he did not regularly meet with, or make written or oral reports to, the 42nd Precinct's commanding officers.  *Id.*  ¶¶ 8–11.  Consistent with this, Captain Bloch testified that he had no regularly scheduled meetings and received no regular reports from Officer Matthews; their interactions were "minimal."  Bloch Dep. 20.  He further testified that, although Captain Bloch would make small talk with Police Officers and speak to them in passing, he would not have regular meetings with any Police Officers in his command.  *Id.* at 15–16.  Captain Bugge similarly testified that he did not have regularly scheduled meetings with Officer Matthews, nor with any Police Officers in his command.  Bugge Dep. 31–32, 34.

### D.    Avenues for Civilian Complaints

Discovery also focused on the degree to which civilians could have made complaints to the commanding officers of the 42nd Precinct in the same manner that Officer Matthews did.[6]

One duty of a commanding officer is to meet with civilians to receive complaints or other feedback about police conduct.  Beirne Dep. 24–25; Bloch Dep. 22, 48; Bugge Dep. 39; *see also* Harrist Decl. Ex. 7 (Patrol Guide section 202-09, setting forth the duties of a commanding officer, including to "[m]aintain as much personal contact as possible with business, civic . . . and other groups or media with community influence and interests to keep abreast of community

---

[6] The Second Circuit has considered this factor in determining whether an employee's speech was made pursuant to his official duties.  *See infra* Part IV(B)(3).

tensions and trends").  For Officer Matthews' precinct, this includes attending monthly meetings of the 42nd Precinct's Community Council.  Bloch Dep. 24; Bugge Dep. 45; *see also* Harrist Decl. Ex. 8–9 (attendance logs and minutes from Community Council meetings).  These meetings typically take place in the precinct and are open to members of the public.  Bloch Dep. 25; Bugge Dep. 45–46.  At these meetings, community members and representatives of community organizations are free to raise concerns about policing practices.  Bloch Dep. 25; Bugge Dep. 46–47.  Captain Bloch testified that he personally attended approximately two dozen such meetings during his three years as commanding officer of the 42nd Precinct.  Bloch Dep. 24.

In addition to the Community Council meetings, members of the community, under some circumstances, may contact commanding officers and meet with them in person, including at the precinct, to discuss concerns about policing practices.  Bloch Dep. 36, 39, 41; Bugge Dep. 64–65; *see also* Harrist Decl. Ex. 8, at NYPD 188 (Community Council meeting minutes, noting that "Inspector Bugge commented that he welcomes the community to call him and discuss problems, but is concerned about complaints that have never been brought to him").  Captain Bloch testified that such meetings happened "rarely."  Bloch Dep. 41.  However, Captain Bugge testified that one to three times per month he meets with members of the community, such as local politicians and leaders of religious or civic organizations, to discuss policing issues.  Bugge Dep. 66.  Some of these meetings took place in his office, and others in the Community Affairs Office or in a common area of the stationhouse.  *Id.*  Such meetings were typically set up through the precinct's Community Affairs Officer, a point of first contact for community members.  *Id.* at 65; Bloch Dep. 39.  For instance, on one occasion, a prominent reverend in the community— who was an advisor to the Community Council board and visited the Community Affairs Office

9

"a couple of times a week"—met with Captain Bugge in his office to discuss his mistreatment during a stop.  Bugge Dep. 58–59.

## II.    Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Applicable Legal Framework

"To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse

action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011); *accord Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 139, 140 (2d Cir. 2008).[7]  Here, the Court only addresses the first element: whether Officer Matthews' speech was protected.

The Supreme Court has articulated a two-step inquiry to determine whether speech by a public employee enjoys constitutional protection.  "The first requires determining whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968)); *accord Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011).  If the answer is yes, then the possibility of a First Amendment claim arises; if the answer is no, it does not.  "The [second] question [is] whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568); *accord Anemone*, 629 F.3d at 119 (referring to this second inquiry as the "*Pickering* defense").  The first of these two inquiries in turn consists of two separate questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as

---

[7] Officer Matthews has also alleged a violation of Article I, Section 8 of the New York State Constitution.  Compl. ¶ 43.  However, this claim is subject to the same analysis as his free speech claims under the First Amendment. *See Carter v. Incorporated Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010), *aff'd*, 415 F. App'x 290 (2d Cir. 2011); *Almontaser v. N.Y.C. Dep't of Educ.*, No. 07 Civ. 10444 (SHS), 2009 WL 2762699, at *2 n.1 (S.D.N.Y. Sept. 1, 2009); *Hous. Works, Inc. v. Turner*, 179 F. Supp. 2d 177, 199 n.25 (S.D.N.Y. 2001).

an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at

420–22).  The Court addresses these two questions here.[8]

## IV.    Discussion

### A.    Whether Officer Matthews' Speech Addressed a Matter of Public Concern

Whether speech addresses a matter of public concern is a question of law "to be answered

by the court after examining the 'content, form, and context of a given statement, as revealed by

the whole record.'"  *Jackler*, 658 F.3d at 235 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48

& n.7 (1983)).  Speech is a matter of public concern when it is "fairly considered as relating to

any matter of political, social, or other concern to the community."  *Connick*, 461 U.S. at 146;

*accord Jackler*, 658 F.3d at 236 ("[A] topic is a matter of public concern for First Amendment

purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to

the public at the time' of the speech." (citation omitted)).  "Speech that, although touching on a

topic of general importance, primarily concerns an issue that is personal in nature and generally

related to the speaker's own situation, such as his or her assignments, promotion, or salary, does

not address matters of public concern."  *Jackler*, 658 F.3d at 236 (citation and alteration

omitted); *see also Sousa v. Roque*, 578 F.3d 164, 170–74 (2d Cir. 2009) (surveying Second

Circuit precedent on whether speech is a matter of public concern).

The Second Circuit has consistently held that the lawfulness of public officials' actions—

including, specifically, police misconduct—is a matter of public concern.  *See, e.g.*, *Jackler*, 658

F.3d at 236–37 (holding that police malfeasance consisting of the use of excessive force is a

matter of public concern, and noting that "[e]xposure of official misconduct, especially within

the police department, is generally of great consequence to the public" (citation omitted));

---

[8] Because the Court finds, for the reasons that follow, that Officer Matthews spoke as a public employee and not as a citizen, the Court has no occasion to address the "*Pickering* defense" here.

*Skehan*, 465 F.3d at 106 ("Plaintiffs' speech plainly concerned issues of public concern: misfeasance within the police department and allegations of an ongoing cover-up and an attempt to silence those who spoke out against it."); *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006) (sheriff disciplining corrections officers in an unlawful manner was a matter of public concern). That standard is met here.  In its decision remanding this case to this Court, the Second Circuit recognized that, as to the speech by Officer Matthews described in the Complaint, "it is undisputed that this speech addressed a matter of public concern."  *Matthews*, 488 F. App'x at 533.[9]

> **B.     Whether Officer Matthews Spoke as a Citizen or an Employee**

The more difficult question is the one that the Second Circuit directed be addressed on remand: whether, following discovery on this point, the facts permit the Court to find, as a matter of law, that Officer Matthews "spoke pursuant to his official duties when he voiced the complaints made here in the manner in which he voiced them."  *Matthews*, 488 F. App'x at 533. The Court has carefully reviewed the undisputed facts.  Considering those facts, viewing the facts that are disputed in the light most favorable to Officer Matthews, and applying apposite case law, the Court finds that Officer Matthews spoke solely as an employee.

> **1.     Public Employee Speech and *Garcetti***

The Supreme Court long ago held that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142 (collecting cases); *accord Garcetti*, 547 U.S. at 417; *Lewis v. Cowen*, 165 F.3d 154, 158 (2d Cir. 1999) ("It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment.").  But

---

[9] At argument, the City conceded that if Officer Matthews' speech occurred as alleged, it necessarily touched on a matter of public concern.

the First Amendment rights of a public employee are not absolute:  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."  *Garcetti*, 547 U.S. at 418.  As the Supreme Court has explained, that is because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  *Id.*  And, because public employees often occupy positions of trust in society, their expression has the potential to "contravene governmental policies or impair the performance of governmental functions."  *Id.* at 419.  At the same time, a public employee does not forfeit the right to free expression that he or she would have absent that job:  "[A] citizen who works for the government is nonetheless a citizen."  *Id.*

The Supreme Court's employee speech cases further reflect that the interests at stake are not merely the speech rights of public employees and the functional needs of public employers— the interests of the public are also implicated.  In *Pickering*, which involved a teacher speaking out against the school board's allocation of funds between educational and athletic programs, the Court recognized that "[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent.  Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."  *Pickering*, 391 U.S. at 572.  The Court therefore recognized the "necessity for informed, vibrant dialogue in a democratic society" and the "widespread costs [that] may arise when dialogue is repressed."  *Garcetti*, 547 U.S. at 419 (describing *Pickering*); *accord San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) ("Were [public employees] not able to speak on [the operations of their employers], the community would be deprived of informed opinions on important public issues.").  As the Supreme Court

14

has put the point, when it comes to the speech of public employees, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Roe*, 543 U.S. at 82. Synthesizing these considerations, the Court has held that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

The line of cases most apposite to Officer Matthews' speech begins with *Garcetti*. There, the Supreme Court applied these principles to employee speech that, undisputedly, occurred in the course of an employee's performance of his day-to-day job duties. In that case, a deputy district attorney alleged that he was punished for writing a disposition memo recommending dismissal of a pending criminal prosecution due to his concerns that an affidavit used to obtain a critical search warrant contained inaccuracies. *Id.* at 414–15. In finding this speech unprotected, the Supreme Court emphasized that it was not dispositive that the plaintiff expressed his views only inside his office, rather than publicly, nor that his speech concerned the subject matter of his employment. *Id.* at 420–21. To deny constitutional protection based on these factors, the Court recognized, would contravene its teachings that employees do not lose all constitutional protection for speech made at work, *see Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979), and that public employees have important perspectives to lend to public discourse about matters of public concern relating to their employment, *see Pickering*, 391 U.S. at 572.

Instead, the Court stated, the "controlling factor" in its analysis was that the plaintiff's expressions had been "made pursuant to his duties as a calendar deputy." *Garcetti*, 547 U.S. at 421. That is, the plaintiff "wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do," and in doing so he "spoke as a prosecutor fulfilling a

responsibility to advise his supervisor about how best to proceed with a pending case." *Id.*
Therefore, the Court held, "when public employees make statements pursuant to their official
duties, the employees are not speaking as citizens for First Amendment purposes, and the
Constitution does not insulate their communications from employer discipline." *Id.*

This holding, the Court explained, was consistent with its precedents governing employee
speech, because the holding did not infringe any right to speak that the plaintiff would have had
had he never become a public employee—*i.e.*, as private citizen: "Restricting speech that owes
its existence to a public employee's professional responsibilities does not infringe any liberties
the employee might have enjoyed as a private citizen." *Id.* at 421–22.  The plaintiff thus stood in
contrast to the teacher in *Pickering*, whose letter to the local newspaper was not part of his job
function and was the sort of letter any citizen could have written:  An ordinary citizen could not
have written an official memo to the plaintiff's supervisors concerning the proper disposition of a
pending criminal case.  *Id.* at 422.  By contrast, to treat the plaintiff's official communications to
his supervisor as protected by the First Amendment protections would "constitutionalize the
employee grievance." *Id.* at 420 (quoting *Connick*, 461 U.S. at 154).

In so ruling, the Supreme Court in *Garcetti* rejected the concern (articulated by a lower
court) that so holding would incent public employees to raise concerns publicly, not through
ordinary in-house channels where they would be more likely to lack First Amendment
protection, thereby causing greater disruption to the public employer's operations.  The relevant
point, the Court stated, is that "[e]mployees who make public statements outside the course of
performing their official duties retain some possibility of First Amendment protection because
that is the kind of activity engaged in by citizens who do not work for the government." *Id.* at

423.  And, in practice, a public employer that wishes to encourage employees to air their

concerns privately can create internal procedures for receiving such criticism.  *Id.* at 424.

Significant here, the parties in *Garcetti* did not dispute, as a factual matter, that the

plaintiff had written his memo pursuant to his official employment duties.  Accordingly, the

Court had "no occasion to articulate a comprehensive framework for defining the scope of an

employee's duties in cases where there is room for serious debate."  *Id.*  Since *Garcetti*, however,

several cases have reached the Second Circuit in which there was serious debate whether the

speech at issue fell within the scope of the employee's duties.  These precedents are instructive,

indeed, decisive here.

### 2.    The Second Circuit's Post-*Garcetti* Precedents

As Judge Calabresi has observed, given the facts and discussion in *Garcetti*, *Garcetti*

was capable of being read narrowly, specifically, to resolve only the issue presented when "the

employee is *required* to make such speech in the course of fulfilling his job duties."  *Weintraub*

*v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 208 (2d Cir. 2010) (Calabresi, J.,

dissenting) (emphasis added).  In that circumstance, such speech is properly viewed as having

been made pursuant to an employee's official duties, as it is fair to say both that the employer

"'commissioned or created' the speech," and that the employer "*relies* on the speech made by the

employee."  *Id.* (quoting *Garcetti*, 547 U.S. at 422, 423) (emphasis in original).  However, the

cases that have arisen in the Second Circuit following *Garcetti* have tended to involve fact

patterns beyond the scenario of required speech presented in *Garcetti*.  Accordingly, the Second

Circuit, applying the principles discussed by the Supreme Court, has extracted from *Garcetti* a

broader understanding of the speech made pursuant to an employee's official duties.

In *Weintraub*, the plaintiff, a public school teacher, had filed a grievance with the teacher's union over his supervisor's decision not to discipline a student who had thrown a book at the plaintiff on two occasions.  *Id.* at 198–99.  A divided panel of the Second Circuit held that the teacher's grievance was unprotected, because he had spoken pursuant to his official duties.  *Id.* at 201.  The Court rejected the teacher's argument that his speech was protected because it was not required by, or included in, his official job description:  "Weintraub's grievance was pursuant to his official duties because it was part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher—namely, to maintain classroom discipline."  *Id.* at 203 (citation omitted).  The Court also noted that the teacher had spoken via a channel—a union grievance—unavailable to citizens generally.  *Id.* at 203–04.  Judge Calabresi dissented, arguing that *Garcetti* should be limited to required employee speech.  *Id.* at 205–09.

In *Ross v. Breslin*, 693 F.3d 300 (2d Cir. 2012), a payroll clerk for the local school district had reported financial malfeasance—specifically, improper disbursements made without the requisite board approval—to the district's superintendent and, when he failed to act, to the board of education.  The Second Circuit held the plaintiff clerk's speech unprotected.  In deposition testimony, the clerk had stated that if there was a mistake with pay requisition, her duty was to "bring it to the appropriate person's attention."  *Id.* at 306 (alteration omitted).  Accordingly, the Court held, "reporting pay irregularities to a supervisor was one of her job duties."  *Id.*  The Court rejected plaintiff's argument that she had spoken as a private citizen because she reported the misconduct to the superintendent and the board, rather than to her direct supervisor:  "Taking a complaint up the chain of command to find someone who will take it seriously does not, without more, transform her speech into protected speech made as a private citizen."  *Id.* at 307 (citation and alteration omitted).  Nor was it dispositive that plaintiff's letter

18

to the board began: "Although I am an employee of the School District, I am writing to you . . . on a personal note out of complete frustration with the District's administration." *Id.* at 303. A plaintiff's characterization of her own speech, the court held, is not dispositive. *Id.* at 307.

In *Looney v. Black*, 702 F.3d 701 (2d Cir. 2012), a town building official had informed a town resident about his concern that the town's use of a wood-burning stove, and the resulting discharge, constituted a public health concern. A divided panel of the Second Circuit held that the building official's speech—the precise content and context of which were vaguely alleged in the Complaint—was unprotected. *Id.* at 712. The Court noted that the plaintiff had alleged that his job duties included "administration and enforcement of the State Building Code at the municipal level, including the organization and conduct of the building advisory, inspection and enforcement program" and that he kept the safety of the townspeople "uppermost in mind" in the performance of these duties. *Id.* Accordingly, the Court stated, the "only sensible way to interpret [plaintiff's] allegations is that he spoke on these issues *because* he was in an official position that required, or at least allowed, him to do so. It follows that these statements owed their existence to his position as the Building Official." *Id.* (emphasis in original).[10]

This streak of victories for employers was interrupted in *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011). Jackler, a probationary police officer, had witnessed a fellow officer punch an arrestee in the face after the arrestee, who was handcuffed and seated in the back seat of a patrol car, insulted the officer. *Id.* at 230. After the arrestee filed a complaint, Jackler was directed by his supervisors to file a report as to what he had seen. His report corroborated the arrestee's

---

[10] Judge Droney dissented. He took issue with what he characterized as the majority's holding that plaintiff's speech was unprotected simply because it "owed its existence" to his job duties. *Looney*, 702 F.3d at 718. Judge Droney would have held that the speech also must have been made "*in furtherance of those duties*," *id.* at 718 (emphasis in original) (quoting *Ross*, 693 F.3d at 308), and that it was premature to conclude, on the pleadings, that plaintiff's speech was unprotected, *id.* at 720.

account, *i.e.*, that the other officer had used unnecessary force.  Jackler alleged that his supervisors then pressured him to retract his truthful report and file a new report that would conceal his fellow officer's misconduct, and retaliated against him when he refused to do so.  *Id.* at 231.  The district court reluctantly concluded that *Garcetti* and *Weintraub* compelled it to dismiss the complaint.  *See Jackler v. Byrne*, 708 F. Supp. 2d 319, 324 & n.5 (S.D.N.Y. 2010). The Second Circuit, however, reversed, holding that Jackler's speech was protected, because he was "not simply doing his job in refusing to obey those orders from the department's top administrative officers and the chief of police."  *Jackler*, 658 F.3d at 242.  The Court emphasized that Jackler's speech had a "clear civilian analogue," because "a citizen who has truthfully reported a crime has the indisputable right to reject pressure from the police to have him rescind his accusation and falsely exculpate the accused."  *Id.* at 241–42.

Officer Matthews relies on *Jackler* here.  But although the two cases are superficially similar in that they both involve a police officer reporting police misconduct, the Second Circuit in *Jackler* pointedly described the protected speech as the *refusal* to retract the truthful report and file a false one.  *See id.* at 240 ("Jackler had a strong First Amendment interest in refusing to make a report that was dishonest."), 241–42 ("We conclude that Jackler's refusal to comply with orders to retract his truthful Report and file one that was false [is protected speech].").  The Court did *not* address whether, let alone hold that, Jackler's original, truthful report would have constituted protected speech had he been retaliated against on that basis.  *See id.* at 234 (stating that the parties agreed that Jackler's retaliation claim was based on his refusal to file the false report, not his filing of the truthful report), 241 ("In the context of the demands that Jackler retract his truthful statements and make statements that were false, we conclude that his refusals to accede to those demands constituted speech activity that was significantly different from the

mere filing of his initial Report.").  But this latter scenario is presented here:  Officer Matthews

made a series of truthful reports about his concerns; unlike Jackler, he was neither compelled to

retract those statements nor to file a false report.  *See Ross*, 693 F.3d at 307–08 (distinguishing

*Jackler* on this basis).

      In non-precedential summary orders, the Second Circuit has addressed two cases with far

more analogous facts to those here than *Jackler*, and ruled for the employer in each.  In *Carter v.*

*Incorporated Village of Ocean Beach*, 693 F. Supp. 2d 203 (E.D.N.Y. 2010), part-time police

officers had complained to their supervisors about certain departmental practices that posed a

threat to public safety, including: hiring officers that were not properly certified; hiring civilians

as police dispatchers; permitting officers to drink alcohol while on duty; and instructing other

officers to chauffeur them home.  The district court held the officers' speech unprotected:

> All of plaintiffs' complaints to their superiors . . . related to their concerns about
> their ability to properly execute their duties as police officers, as they expressed
> concern, *inter alia*, that the assignment of officers to chauffeur intoxicated
> officers left the [Ocean Beach Police Department] short-handed, that the hiring of
> uncertified officers and the retention of unqualified and/or corrupt officers
> affected their ability to perform their job assignments safely and that they were
> told not to issue summonses to certain individuals and businesses.  Plaintiffs'
> speech in challenging the Ocean Beach defendants' alleged cover-ups of officer
> misconduct, including their complaints to the Suffolk County District Attorney's
> Office, was undertaken in the course of performing one of their core employment
> responsibilities of enforcing the law and, thus, was speech made pursuant to their
> official duties.  Moreover, all of the relevant speech reflected plaintiffs' special
> knowledge about the Ocean Beach defendants which was gained as a result of
> plaintiffs' position as police officers for those defendants based upon what
> plaintiffs' [*sic*] observed or learned from their job.

*Id.* at 211.  Accordingly, the district court granted summary judgment for defendants.  The

Second Circuit affirmed.  It stated:  "Plaintiffs' allegations establish no more than that they

reported what they believed to be misconduct by a supervisor up the chain of command—

misconduct they knew of only by virtue of their jobs as police officers and which they reported

as 'part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties.'"
*Carter v. Inc. Vill. of Ocean Beach*, 415 F. App'x 290, 293 (2d Cir. 2011) (summary order)
(quoting *Weintraub*, 593 F.3d at 203).

　　Similarly, in *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340 (S.D.N.Y. 2010) (Rakoff, J.), an
investigator in the New York State Department of Health's Bureau of Narcotics Enforcement
had complained to the Bureau's program director that his immediate supervisor was, *inter alia*,
violating suspects' *Miranda* rights and performing "ill-conceived and dangerous" arrests and
searches.  The plaintiff investigator had also filed a workplace incident report and informed the
Inspector General.  *Id.* at 351.  Observing that "*Weintraub* made clear that . . . 'official duties'
are to be construed broadly," the district court held, "not without reluctance," that plaintiff's
speech was made pursuant to his official duties.  *Id.* at 353.  It observed that "the common theme
of all these statements was that [the supervisor] was violating suspects' rights and was not
performing his job properly, and by implication that [the supervisor] was interfering with
[plaintiff's] ability to perform his own duties."  *Id.*  Because it was a part of plaintiff's duties to
ensure that investigations and arrests of narcotics offenses be lawfully conducted, plaintiff's
speech was therefore "'part-and-parcel of his concerns' about his ability to 'properly execute his
duties' as a[n] investigator."  *Id.* at 354 (quoting *Weintraub*, 593 F.3d at 203).  In addition, the
district court noted, the plaintiff was required by New York law to file his workplace incident
report and the complaint to the Inspector General.  It stated:  "Speech made pursuant to a public
employee's legal obligations is not made 'as a citizen.'"  *Id.* (citing N.Y. Labor Law § 27-b(6)(a)
& N.Y. Exec. Law § 55(1)).[11]  On appeal, plaintiff focused on his complaint to the Inspector
General, but the Second Circuit affirmed by summary order.  It found that plaintiff's speech was

---

[11] Defendants do not argue that the same laws are applicable here.

unprotected because his complaint had been mandated by law and thus was part-and-parcel of his

employment duties. *D'Olimpio v. Crisafi*, 462 F. App'x 79, 81 (2d Cir. 2012) (summary order).

The court distinguished *Jackler* on the grounds that that that case concerned only Jackler's

refusal to retract a truthful statement. *Id.* at 81 n.1.

Taken together, *Weintraub*, *Ross*, and *Looney*, along with various non-precedential

summary orders,[12] reveal that the Second Circuit has taken a broader view than was necessary to

decide *Garcetti* of what constitutes speech pursuant to an employee's official duties. *See also*

*Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115–17 (2d Cir. 2011) (plaintiff, as Director of

Security at MTA, spoke pursuant to his employment duties when he contacted Queens DA's

office regarding allegations of corruption); *Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010)

(employee's report to supervisor that co-workers were selling bootleg DVDs at work and about

reverse discrimination was unprotected where made during daily meetings convened to discuss

---

[12] *See, e.g.*, *D'Olimpio*, 462 F. App'x at 81; *Carter*, 415 F. App'x at 293; *Platt v. Inc. Vill. of Southampton*, 391 F. App'x 62 (2d Cir. 2010) (summary order); *Paola v. Spada*, 372 F. App'x 143, 144 (2d Cir. 2010) (summary order) (state trooper's report about supervisor's unlawful conduct was unprotected because employee manual required him to report wrongdoing up the chain of command or to internal affairs); *Barclay v. Michalsky*, 368 F. App'x 266, 268 (2d Cir. 2010) (summary order); *Mulcahey v. Mulrenan*, 328 F. App'x 8, 9 (2d Cir. 2009) (summary order); *Healy v. City of N.Y. Dep't of Sanitation*, 286 F. App'x 744, 746 (2d Cir. 2008) (summary order); *cf. Bearss v. Wilton*, 445 F. App'x 400, 403 (2d Cir. 2011) (summary order) (plaintiff's response to newspaper's inquiries was unprotected where such inquiries were to be directed to her as city's technology coordinator); *Drolett v. DeMarco*, 382 F. App'x 7, 8 (2d Cir. 2010) (summary order) (after district court found that factual dispute precluded summary judgment on whether police officer's letter to police commissioners, local politician, and local newspaper about police misconduct was protected speech and rejected argument that police manual compelled the speech, Second Circuit reversed denial of qualified immunity, finding no violation of clearly established rights and noting, "[h]ad [plaintiff] raised his concerns within the chain of command, that speech likely would have been made pursuant to his official duties, and therefore not protected by the First Amendment").

the employees in their division).  The great majority of district court decisions applying these precedents have drawn the same conclusion.[13]

---

[13] *See, e.g.*, *Schoolcraft v. City of N.Y.*, No. 10 Civ. 6005 (RWS), 2012 WL 2161596, at *8 (S.D.N.Y. June 14, 2012) (police officer's objections to, *inter alia*, arrest and summons quota policy, which were confined to his supervisors, Internal Affairs, and the Quality Assurance, were unprotected); *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 506–08 (E.D.N.Y. 2011) (police officer's internal memo to supervisors addressing communications problem within department that led to dangerous situations not protected); *Pisano v. Mancone*, No. 08 Civ. 1045 (KMW), 2011 WL 1097554, at *10–13 (S.D.N.Y. Mar. 18, 2011) (where police officer approached town mayor at his home, his speech about the internal workings of the police department, such as its lack of internal rules or policies and the police chief's issuance of orders to commit unlawful arrests, was unprotected, whereas his complaint that the police chief had not taken the civil service exam as required by state law was protected); *Brady v. Cnty. of Suffolk*, 657 F. Supp. 2d 331, 344–54 (E.D.N.Y. 2009) (police officers' internal memo and oral statements to supervisors about policy of not ticketing off-duty officers not protected); *Platt v. Inc. Vill. of Southampton*, No. 08-CV-2953 (JS)(ARL), 2009 WL 3076099, at *5–6 (E.D.N.Y. Sept. 21, 2009) (police officer's report to village trustee that police lieutenant was having an affair with another officer and giving her preferential treatment was unprotected where the report "primarily sought to address personal grievance rather than advance public safety concerns"), *aff'd*, 391 F. App'x 62 (2d Cir. 2010) (summary order); *Mulcahey v. Mulrenan*, No. 06 Civ. 4371 (LBS), 2008 WL 110949, at *5–7 (S.D.N.Y. Jan. 3, 2008) (Sand, J.) (firefighter's internal memo expressing his concerns that he was unqualified to perform certain duties, putting himself and coworkers in danger, was unprotected), *aff'd*, 328 F. App'x 8 (2d Cir. 2009) (summary order); *Barclay v. Michalsky*, 493 F. Supp. 2d 269, 275 (D. Conn. 2007) (nurse's report to supervisors that her co-workers were mistreating patients and sleeping on the job not protected where employee work rules required such a report), *aff'd*, 368 F. App'x 266, 268 (2d Cir. 2010) (summary order); *Healy v. City of N.Y. Dep't of Sanitation*, No. 04 Civ. 7344 (DC), 2006 WL 3457702, at *5 (S.D.N.Y. Nov. 22, 2006) (employee's report of corruption uncovered during inventory check unprotected where report was made to superior who ordered the inventory check be performed, was not made externally, and plaintiff originally testified alleged that he made the report as part of his duties, only to recant after *Garcetti* came down), *aff'd*, 286 F. App'x 744, 746 (2d Cir. 2008) (summary order).  *But see Griffin v. City of N.Y.*, 880 F. Supp. 2d 384, 394–400 (E.D.N.Y. 2012) (police detective's complaint to Internal Affairs that a fellow detective had attempted to pressure him to falsely accept blame for a botched homicide investigation was protected); *Anderson v. State of N.Y. Office of Court Admin. of Unified Court Sys.*, 614 F. Supp. 2d 404, 427–29 (S.D.N.Y. 2009) (attorney on disciplinary committee's complaints to supervisors about committee's failure to vigorously prosecute complaints against attorney accused of misconduct were protected because they addressed systemic problems, not individual cases); *Wallace v. Suffolk Cnty. Police Dep't*, No. 04 Civ. 2599 (JS), 2007 WL 7749467, at *5–7 (E.D.N.Y. Feb. 5, 2007) (police officer, who was injured in the line of duty, engaged in protected speech when he complained to his supervisors that the report concerning his injury had been forged and omitted some of his injuries, and that improper training had led to the explosion that caused his injuries).

### 3.    Application

With the Second Circuit's teachings in mind, the Court turns to the fact-specific inquiry whether the speech in question here was made pursuant to Officer Matthews' official duties. "Th[is] inquiry . . . is not susceptible to a brightline rule.  Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross*, 693 F.3d at 306.  The inquiry is to be both "practical," *Garcetti*, 547 U.S. at 424, and "objective," *Weintraub*, 593 F.3d at 202.  Although the Supreme Court did not prescribe a "comprehensive framework for defining the scope of an employee's duties," *Garcetti*, 547 U.S. at 424, four factors identified by the Court and the Second Circuit, considered in combination, compel the finding that Officer Matthews' complaints to his supervisors about the quota system were made pursuant to his official duties.

*1. The Patrol Guide***:**  Section 207-21 of the Patrol Guide unambiguously imposed on Officer Matthews a duty to report the fact of "unjustified stops, arrests, and summonses" that he alleged had been occurring as a result of the quota system.  The plain text of Section 207-21 imposes a duty to report "[c]riminal activity or other misconduct of any kind including the use of excessive force or perjury that is committed by a member of the service whether on or off duty." Fraenkel Decl. Ex. B.  The Patrol Guide sets performance expectations for members of the NYPD, *see* Fraenkel Reply Decl. Ex. E, and Officer Matthews testified that he did not consider its procedures to be optional, *see* Matthews Dep. 10–11.  By reporting a policy that he asserted had already produced a pattern of unjustified (*i.e.*, unlawful) stops, arrests, and summonses, Officer Matthews was necessarily reporting "misconduct" within the meaning of the Patrol Guide.

Officer Matthews argues that his own deposition testimony, in which he attested that it is his view that Section 207-21 requires only the reporting of *criminal* misconduct, creates a material factual dispute over the meaning of the phrase "or other misconduct."[14]  *See* Matthews Dep. 14, 19, 21, 24–25, 33, 37, 39.  But, whatever Officer Matthews' subjective belief, the plain language of Section 207-21 cannot be so read.  Section 207-21 unconditionally requires reporting of "criminal activity" *and* "other misconduct."  Officer Matthews' reading overlooks the term "other misconduct" and treats it as superfluous.  Moreover, although Officer Matthews testified generally that this understanding derived from his training, *see id.* at 24, 34, he did not offer any evidence (*e.g.*, a training manual or other documentary evidence) supporting this contra-textual

---

[14] The Second Circuit has described the question whether an employee spoke solely as an employee or as a citizen as "largely a question of law for the court."  *Jackler*, 658 F.3d at 237. In *Connick*, the Supreme Court stated that "[t]he inquiry into the protected status of speech is one of law, not fact."  *Connick*, 461 U.S. at 138 n.7.  However, since *Garcetti* described the employee speech inquiry as a "practical one" requiring fact-specific inquiry into the nature of the speech and the nature of the employee's duties, circuits have described the nature of this inquiry differently, with some casting it as a pure question of law and others as a mixed question of law and fact.  *See Fox v. Traverse City Area Public Schools Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010) (surveying circuit split).  *Compare Deutsch v. Jordan*, 618 F.3d 1093, 1098 (10th Cir. 2010) (question of law, but which may turn on jury's resolution of factual disputes such as precisely what plaintiff said), *Charles v. Grief*, 522 F.3d 508, 513 n.17 (5th Cir. 2008) (question of law, involving examination of underlying factual issues), *and Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (question of law), *with Reilly v. City of Atl. City*, 532 F.3d 216, 227 (3d Cir. 2008) (mixed question of law and fact), *and Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127–29 (9th Cir. 2008) (same).  This Court reads *Jackler* to hold that, however described, the protected status of employee speech is ultimately a question of law for the court, but which must be determined by reference to the attendant facts and circumstances. Accordingly, where a fact critical to this legal analysis is disputed, the fact-finder must resolve the factual dispute before resolving this question of law.  *See Anemone*, 629 F.3d at 117 (assuming *arguendo* that material disputes of fact exist as to whether employee spoke in official capacity or as a private citizen); *Pisano*, 2011 WL 1097554, at *9 ("The application of these tests is generally a matter of law for the court to decide, but in some instances, questions of fact will need to be resolved by a fact-finder before the court can apply the test.").  In this case, because Officer Matthews' report of illegal stops, arrests, and summonses unambiguously was compelled by Section 207-21, the Court has no occasion to opine on how the inquiry would be properly cast or conducted had it turned on the resolution of disputed factual questions.

reading of Section 207-21, *see id.* at 39.  And he specifically testified that he *would* have a duty to report unjustified stops, arrests, and summonses—exactly the conduct at issue here.  *Id.* at 18.[15]

To be sure, it is generally not dispositive of the employee speech question that a duty to make such speech is listed in a manual:  "[T]he listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25.  But this factor is highly relevant:  The Second Circuit has "frequently confronted similar situations where, as in *Garcetti*, the speech at issue was expressly part of the employee's official job duties and thus not protected under the First Amendment." *Griffin*, 880 F. Supp. 2d at 395 (collecting cases); *see Paola*, 372 F. App'x at 144 (state trooper's report about supervisor's unlawful conduct was unprotected because employee manual required him to report wrongdoing up the chain of command or to internal affairs); *Barclay*, 368 F. App'x at 268 (nurse's report to supervisors that her co-workers were mistreating patients and sleeping on the job not protected where employee work rules required such a report); *cf. D'Olimpio*, 462 F. App'x at 80 (affirming district court's conclusion that plaintiff's report of misconduct was unprotected because it was compelled by state law).  And the concern animating the observation in *Garcetti*, that an excessively broad job description be determinative of whether an employee's

---

[15] Officer Matthews twice tried to blunt the effect of this testimony.  First, in his deposition, he clarified that he would have no duty to report an unjustified stop based simply on an error in judgment; rather, he would only need to report intentionally unjustified stops.  *See* Matthews Dep. 25, 28.  But Officer Matthews alleges in the Complaint that officers were forced to "abandon their discretion in order to meet their numbers," which implies willful conduct. Compl. ¶ 28.  Second, Officer Matthews filed an affidavit stating that he did not report "any particular" unjustified stop or arrest, just the broader practice.  Matthews Decl. ¶ 13.  But if Officer Matthews had a duty to report *particular* unjustified stops and arrests, surely he would also have a duty to report *a pattern of* unjustified stops and arrests, which is precisely what he claims to have done.  Compl. ¶ 28.

speech is constitutionally protected, is absent here.  Section 207-21 does not sweep broadly.

Instead it imposes on police officers the unsurprising obligation of reporting criminal activity

and other misconduct within the NYPD.[16]

For this reason, Officer Matthews' claim that reliance on Section 207-21 to define his job

duties might strip police officers of any right to protest unlawful activity does not carry the day.

A public employer may not strip its employees of all First Amendment protection by fashioning

an excessively broad description of their official duties.  Dissenting in *Garcetti*, Justice Souter

voiced concern that "a response to the Court's holding will be moves by government employers

to expand stated job descriptions to include more official duties and so exclude even some

currently protectable speech from First Amendment purview."  *Garcetti*, 547 U.S. at 431 n.2.  In

response, however, the majority clarified:  "We reject, however, the suggestion that employers

can restrict employees' rights by creating excessively broad job descriptions."  *Id.* at 424.  Here,

Officer Matthews' fears are overstated, because Section 207-21, as interpreted here to require the

reporting of unlawful stops and arrests, is neither overbroad nor overreaching.  *See Schoolcraft*,

2012 WL 2161596, at *6 (relying on Patrol Guide Section 207-21 as a factor indicating that

plaintiff's speech about quota policies in the NYPD was pursuant to his duties as a police

officer).  *But see Griffin*, 880 F. Supp. 2d at 397 (rejecting argument that Section 207-21

forecloses detective's claim to First Amendment protection where he reported to Internal Affairs

that another detective had asked him to lie during official investigation by taking blame for a

failed murder investigation).  Unjustified arrests are a frequent source of civil liability, *see* 42

---

[16] Officer Matthews notes that he raised his complaints to his supervisor, rather than to Internal Affairs, as Section 207-21 directs, but that does not affect the First Amendment analysis.  *See Ross*, 693 F.3d at 306 (rejecting claim that plaintiff's speech was protected because she made it outside the employer's designated channel); *Anemone*, 639 F.3d at 116 (same).

U.S.C. § 1983, and, under extreme circumstances, criminal liability, *see* 18 U.S.C. § 242.  The claim that a departmental policy that requires police officers to report a pattern of such violations of law is overbroad is unpersuasive.[17]

In holding that Section 207-21 supports defendants' claim that Officer Matthews' speech was within his job responsibilities, the Court is mindful that formal descriptions "often bear little resemblance to the duties an employee actually is expected to perform."  *Garcetti*, 547 U.S. at 424–25.  "[S]peech can be pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Weintraub*, 593 F.3d at 203 (alterations omitted); *accord Ross*, 693 F.3d at 305.  Accordingly, the Court proceeds to consider other factors identified by the Supreme Court and the Second Circuit as relevant to that inquiry.  These factors point in the same direction.

*2. **Subject Matter of Employment***:  Officer Matthews' remarks about illegal stops and arrests, and about the quota policy that brought that misconduct about and to which he claimed he was personally subject, concerned the subject matter of his employment, owed its existence to his employment, and was made in furtherance of that employment.  Where an employee's speech is "part-and-parcel of his concerns about his ability to properly execute his duties," it is unprotected.  *Weintraub*, 593 F.3d at 203 (citation omitted); *accord Carter*, 415 F. App'x at 293

---

[17] Officer Matthews notes that defendants relied on Section 207-21 in their brief to the Second Circuit defending Judge Jones's dismissal of his Complaint.  He argues that that Court's summary reversal, "though it did not expressly discuss the City's reliance on section 207-21, makes clear that section 207-21 cannot be the basis for disposing of Officer Matthews's First Amendment claim."  Pl. Br. 16.  But that is not so.  Officer Matthews argued on appeal that Section 207-21 had not been before the Court on the motion to dismiss, and noted that Judge Jones had not referred to it in granting that motion.  Far from finding Section 207-21 inapposite, the Second Circuit directed this Court to inquire into Officer Matthews' job responsibilities, *Matthews*, 488 F. App'x at 533, and this Court has carefully done so.  Section 207-21 bears on that inquiry.

(affirming decision that speech was unprotected where it concerned officers' ability to perform their own duties).  Here, the Complaint indicates that Officer Matthews spoke out of concern about the effect the quota system had on his and other officers' abilities to perform their duties: It alleges that "police officers felt forced to abandon their discretion in order to meet their numbers" and that the quota system was "having an adverse effect on *the precinct's* relationship with the community."  Compl. ¶ 28 (emphasis added).  To be sure, Officer Matthews also alleged that the quota system harmed the public.  *See id*. ¶ 1 (alleging that Officer Matthews' complaint "comes in the context of a city-wide controversy over the NYPD's use of illegal quotas and the damage such quotas inflict on innocent people, policing, and police-community relations").  But Officer Matthews placed significant emphasis on his ability to do his own job; his reference to a related public interest did not transform an employment dispute into citizen speech.  *See Brady*, 657 F. Supp. 2d at 348 ("[M]any aspects of a police officer's job duties, and those of many other public employees, directly impact issues important to the citizenry; simply mentioning this potential impact is not enough, by itself, to turn employees' internal disputes with their superiors about official matters into First Amendment claims.").  As alleged in the Complaint, Officer Matthews, by challenging a policy he believed was impeding his and fellow officers' abilities to carry out their duties, was plainly acting in furtherance of his employment.

Officer Matthews' speech also "owed its existence to" his employment.  Like the building official in *Looney* and the payroll clerk in *Ross*, Officer Matthews gained the information he reported while doing his job.  *See Looney*, 702 F.3d at 712; *Ross*, 693 F.3d at 306; *see also Carter*, 415 F. App'x at 293 (affirming holding that speech about "misconduct [plaintiffs] knew of only by virtue of their job as police officers" was unprotected).  To be sure, not all speech reporting information learned in the course of one's employment is unprotected; as

the Supreme Court has noted, public employees are often the only people with information about their employer's practices, and leaving such speech unprotected could deprive the public of valuable insights.  *See Garcetti*, 547 U.S. at 419–21 ("The First Amendment protects some expressions related to the speaker's job."); *Pickering*, 391 U.S. at 572.  Here, Officer Matthews' speech was on a subject of consequence:  It stood to notify the public that unlawful stops and arrests in the 42nd precinct were occurring and were rooted in an internal quota system.  *See Griffin*, 880 F. Supp. 2d at 400.  However, in assessing whether or not Officer Matthews' speech was constitutionally protected, the fact that it directly implicated the subject matter of his employment supports a finding that it was not.  *See Looney*, 702 F.3d at 712; *Ross*, 693 F.3d at 306; *Frisenda*, 775 F. Supp. 2d at 506.

   ***3. Internal Speech*:**  A public employee does not "forfeit[] his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly."  *Givhan*, 439 U.S. at 695–96; *accord Garcetti*, 547 U.S. at 420–21.  Nevertheless, speech confined to internal channels tends to look less like citizen speech than does the paradigmatic letter to the editor.  *See Garcetti*, 547 U.S. at 423; *Ross*, 693 F.3d at 306 ("Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision."); *Weintraub*, 593 F.3d at 205 (contrasting teacher's union grievance to a case where an employee pursued his complaints at a public press conference); *Healy*, 286 F. App'x at 746 (that employee reported finding of corruption only to his supervisor, not externally, supported finding that speech was unprotected); *Frisenda*, 775 F. Supp. 2d at 506 (police officer's internal memo unprotected in part because no indication that he made external complaints); *see also Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) ("If however a public employee takes his job concerns to persons outside the work place in addition to raising

them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen.").

Here, Officer Matthews' speech was internal to the precinct—it was made to his direct supervisor.  It is an ironic artifact of First Amendment law that Officer Matthews' decision to keep his complaints in-house, rather than airing the NYPD's dirty laundry to the media, results in a loss of protection.  *See Singer v. Ferro*, 711 F.3d 334, 341 (2d Cir. 2013) ("[W]e acknowledge that there is no little irony in the fact that [plaintiff's] claim suffers because he did not make more serious allegations or circulate his criticism publicly, to the likely greater injury of the defendants.").  But the Supreme Court recognized that irony in *Garcetti*, and ruled against the employee nonetheless.  *Garcetti*, 547 U.S. at 423–24.[18]

**4.  *Lack of Civilian Analogue*:**  A final relevant factor is whether there is a civilian analogue to Officer Matthews' speech.  Where an employee speaks in a manner that no private citizen could, depriving the employee of First Amendment protection for such speech does not strip him of a right he would have had but for his employment.  *See Garcetti*, 547 U.S. at 422, 424; *Weintraub*, 593 F.3d at 206 (Calabresi, J., dissenting).  Instead, it puts him in the position he would have been in but for the fact of employment.  The presence or absence of a civilian analogue is thus relevant to the issue at hand.  *Weintraub*, 593 F.3d at 204; *see Jackler*, 658 F.3d at 241 (finding protected speech where plaintiff's refusal to retract his truthful report and file a false one "has a clear civilian analogue"); *cf. Bowie v. Maddox*, 653 F.3d 45, 48 (D.C. Cir. 2011)

---

[18] This irony is mitigated by the fact that the absence of a First Amendment cause of action does not mean that public employees relinquish their rights under applicable federal or state laws, *e.g.*, those that protect whistleblowers.  *See Garcetti*, 547 U.S. at 425–26; *Ross*, 693 F.3d at 307.  The Complaint here, however, is not brought under such laws.

(holding that the existence of a civilian analogue does not alone render speech protected, because "[a]ll official speech, viewed at a sufficient level of abstraction, has a civilian analogue").[19]

Examples of speech with a civilian analogue include a letter to the local newspaper, *see Garcetti*, 547 U.S. at 423, and complaints to elected officials or independent state agencies, *see Weintraub*, 593 F.3d at 204; *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006). In *Jackler*, the Second Circuit found a civilian analogue to Jackler's refusal to retract his truthful report and file a false one, because a citizen has the right to file a report with the police department, and, having done so, "has the indisputable right to reject pressure from the police to have him rescind his accusation and falsely exculpate the accused." *Jackler*, 658 F.3d at 241. By contrast, examples of speech lacking such an analogue include an official report made to a supervisor, *see Garcetti*, 547 U.S. at 422–23, and an employee grievance filed in a forum unavailable to non-employees, *see Weintraub*, 593 F.3d at 203.

Here, Officer Matthews likens his oral complaints to his commanding officers to the reports or complaints which a civilian is, of course, free to make to a police department. *Jackler*, 658 F.3d at 241; *see also Griffin*, 880 F. Supp. 2d at 399–400 (citizens may report misconduct to the police department through the Internal Affairs Bureau in the same manner that NYPD

---

[19] Judge Calabresi has read the majority in *Weintraub* to treat the presence of a civilian analogue as a *necessary* condition for constitutional protection. *See Weintraub*, 593 F.3d at 206. The D.C. Circuit, by contrast, has interpreted the Second Circuit as holding, in *Jackler*, that the presence of a civilian analogue is a *sufficient* condition for such protection. *See Bowie*, 653 F.3d at 48. It appears to this Court that the most apt description of the Circuit's doctrine on this point is that the presence or absence of a civilian analogue is a relevant, but not invariably dispositive, factor. In *Weintraub*, the Court stated that its finding of employee speech was "*supported by* the fact that [plaintiff's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue," *Weintraub*, 593 F.3d at 203 (emphasis added), and that the lack of a civilian analogue is "not dispositive," *id.* at 204. *Jackler*, in turn, identified the presence of a civilian analogue as an important indicator that Jackler had not spoken as an employee. *See Jackler*, 658 F.3d at 240. It appears that the Second Circuit has thus viewed the presence of a civilian analogue as neither necessary nor sufficient, but simply a factor that "bear[s] on the perspective of the speaker." *Weintraub*, 593 F.3d at 204.

officers can).  But Officer Matthews did not file a police report or call Internal Affairs.  Instead, he made his reports to the commanding officers of the 42nd Precinct during a series of in-person meetings in the precinct.  The decisive question is, therefore, whether *this* is a "channel[]" available to citizens generally."  *Weintraub*, 593 F.3d at 204.

Officer Matthews argues that civilians may make such complaints in the manner that he did.  He notes that the 42nd Precinct's commanding officer has a duty to meet with civilians to receive feedback about police conduct, *see* Beirne Dep. 24–25; Bloch Dep. 22, 48; Bugge Dep. 39; Harrist Decl Ex. 7, and points to Captain Bloch's and Captain Bugge's attendance at public meetings of the 42nd Precinct's Community Council, *see* Bloch Dep. 24–25; Bugge Dep. 45–47, and to their availability for additional in-person meetings to address specific concerns, *see* Bloch Dep. 36, 39, 41; Bugge Dep. 64–65; Harrist Decl. Ex. 8, at NYPD 188.  Officer Matthews also identifies at least one occasion in which Captain Bugge met in person in his office with a local reverend to discuss his mistreatment during a stop.  Bugge Dep. 58–59.

On the other hand, as the City notes, relative to the average citizen, Officer Matthews had superior access to his commanding officers.  He spoke with Captain Bugge about the existence of the quota system in February, March, April, June, and October 2009, and with another precinct executive in May 2009.  Compl. ¶¶ 20–21.  In January 2011, after Captain Bugge was replaced by Captain Bloch—who, apparently, met less frequently with community members, *see* Bloch Dep. 41—Officer Matthews spoke with Captain Bloch.  Compl. ¶ 28.  By contrast, the only specific instance of a civilian's meeting in person with a commanding officer of the 42nd Precinct in a manner akin to Officer Matthews' involved a prominent local reverend who was an advisor to the Community Council board and was otherwise in the Community Affairs Office "a couple of times a week."  *See* Bugge Dep. 58–59.  Further, even for such local leaders, such

meetings would be set up through the Community Affairs Office, which would often resolve the issue at hand before the civilian ever got face time with the commanding officer.  *See* Bugge Dep. 65.

   For these reasons, it is not correct for Officer Matthews to claim that the average civilian enjoyed access to the channel which he used to lodge his complaint about unlawful stops and arrests and about the quota system.  *See Williams v. Cnty. of Nassau*, 779 F. Supp. 2d 276, 285–86 (E.D.N.Y. 2011) ("While citizens may write letters to, or request meetings with, the Deputy County Executive, none would have the kind of access to [the Deputy County Executive] that [plaintiff] had as Executive Director of the [Civil Service Commission].").  In so noting, the Court recognizes that Officer Matthews did not make his complaints during regularly scheduled meetings with his commanding officers, *see* Matthews Decl. ¶¶ 8–11; Bloch Dep. 20; Bugge Dep. 31–32, 34; *see also Huth*, 598 F.3d at 74 (involving employee's complaints raised during daily meetings convened to discuss such matters), and that for there to be a civilian analogue there need not be perfect symmetry between the manner in which the plaintiff spoke and the channels available to the ordinary civilian.  But the differences here are significant.  Officer Matthews was able to get the ear of his commanding officers more readily, more frequently, and more privately than could an average citizen.  Accordingly, this factor, too, supports a finding that Officer Matthews spoke pursuant to his official duties.

   \*                         \*                         \*

   Taken together, the above factors, derived from *Garcetti* and its Second Circuit progeny, require the finding that, when Officer Matthews reported unlawful stops, arrests, and summonses and the quota policy from which they derived, he spoke as an NYPD employee, not a citizen. Officer Matthews' speech was compelled by the NYPD Patrol Guide; concerned the subject

matter of his employment; was made internally; and lacked a direct civilian analogue.  His speech therefore was not constitutionally protected.

In so holding, the Court recognizes that, as a matter of fact, Officer Matthews' speech had undeniable value to the public.  The enforcement priorities of the NYPD may profoundly affect the lives of New Yorkers.  And there is a paramount public interest in shining a light on a policy that allegedly incents or causes police officers to violate citizens' rights not to be subject to unlawful stops and arrests.  Reinforcing that notion, the quota system that Officer Matthews protested would, in fact, today violate New York state law.  *See* N.Y. Labor Law § 215–a (effective Aug. 30, 2010).  Officer Matthews' speech had the potential to contribute usefully to public discourse on issues of consequence.  *See Pickering*, 391 U.S. at 572.

However, as a matter of law, *Garcetti* and its Second Circuit progeny teach that not all speech by public employees enjoys First Amendment protection.  Public employees who wish to lend their voice to the public debate in a way that enables them to claim such protection for their words must be mindful that the First Amendment does not "constitutionalize the employee grievance," *Garcetti*, 547 U.S. at 420 (citation omitted), and that the availability of such protection will ineluctably turn on a fact-intensive inquiry as to whether such speech was made pursuant to the employee's duties.  *See id.* at 424; *Ross*, 693 F.3d at 306.  The facts here have led the Court to deny such protection to Officer Matthews' speech.  His speech was more in the nature of an employee grievance than a political statement.  But whether speech in the future by police officers protesting unlawful police practices will be similarly classified will turn on the facts and the context.  A police officer's inherent duty to enforce the law does not invariably

deprive him or her of First Amendment protection for speech that tends to reveal unlawful police practices.[20]

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted. The Clerk of Court is directed to terminate the motion pending at docket number 35, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 29, 2013
     New York, New York

---

[20] Nor does such an officer relinquish his rights under relevant whistleblower laws. *See Garcetti*, 547 U.S. at 425–26; *Ross*, 693 F.3d at 307.